COURT OF APPEALS
DECISION
DATED AND FILED

May 12, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP2280-CR**

Cir. Ct. No. 2021CF597

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

KEVIN JOSEPH GRANT,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for St. Croix County: SCOTT R. NEEDHAM, Judge. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM. Kevin Grant appeals a judgment, entered upon a jury's verdicts, convicting him of arson of a building with the intent to defraud; second-degree recklessly endangering safety; unsafe burning of one's own

building; and making a fraudulent insurance claim in an amount greater than $2,500. Grant also appeals an order requiring him to pay restitution to his insurer. He claims that the evidence was insufficient to support the verdicts; the prosecutor made improper comments during closing argument; his sentence was excessive; and the restitution award was contrary to law. We reject each of these arguments and affirm both the judgment of conviction and the restitution order.

## BACKGROUND

¶2 The charges arose out of a fire that occurred in a building known as the Cubby Hole in the early morning hours of December 29, 2018. The State alleged that Grant, who owned the building with his wife, set the fire with a space heater, bundled matchsticks, and gasoline and subsequently sought to collect insurance proceeds for damage to the building caused by the fire. A jury found Grant guilty on all four counts following a nine-day trial.

¶3 The circuit court sentenced Grant to five years' initial confinement followed by five years' extended supervision on the count of arson of a building with intent to defraud; to a consecutive term of three years' initial confinement followed by five years' extended supervision on the reckless endangerment count; to a concurrent term of two years' initial confinement followed by three years' extended supervision on the count of unsafe burning of one's own building; and to a concurrent term of one and one-half years' initial confinement followed by one and one-half years' extended supervision on the count of making a fraudulent insurance claim. The court subsequently entered an order awarding $582,836.03 in restitution to Grant's insurer, State Farm Insurance Company.

¶4 On this appeal, Grant challenges the sufficiency of the evidence to support the jury's verdicts, characterizing it as "circumstantial" and not strong

2

enough "to exclude every reasonable hypotheses of [Grant's] innocence." He further raises a uniformity challenge to the reckless endangerment count. Alternatively, Grant claims that he is entitled to a new trial under the plain error doctrine because the prosecutor made comments during closing argument asserting the prosecutor's "personal belief or opinion" as to Grant's guilt. Grant also argues that the circuit court erroneously exercised its discretion by imposing what "may well be a life sentence given [Grant's] age," based in part upon what Grant views as the court's "misplaced" emphasis on the danger faced by responding firefighters. Finally, Grant contends that the court also erred by awarding restitution to State Farm when Grant's wife, who was not involved in the arson, is a named insured entitled to collect on the policy. Because Grant's claims are all highly fact-intensive, we will discuss more detailed facts relevant to each claim in the corresponding sections below.

## DISCUSSION

### I. Sufficiency of the Evidence

¶5    Grant contends that the evidence was insufficient to support the verdicts on the counts of arson, burning his own building, and filing a fraudulent insurance claim because the evidence could not exclude the possibility that someone else started the fire. As a threshold matter, we observe that Grant's challenge to the sufficiency of the evidence is premised upon a misstatement of the standard of review applicable to such claims. Grant relies upon *Taylor v. State*, 74 Wis. 2d 255, 265, 246 N.W.2d 516 (1976), for the proposition that the test for the sufficiency of the evidence in a circumstantial evidence case is whether the evidence is "strong enough to exclude every reasonable hypothesis of innocence." The Wisconsin Supreme Court explicitly overruled that proposition

from *Taylor*, however, in *State v. Poellinger*, 153 Wis. 2d 493, 504-05 & n.5, 451 N.W.2d 752 (1990).

¶6      *Poellinger* explained that the rule directing a jury to exclude every reasonable hypothesis of innocence refers only to the evidence the jury believes and relies upon to support the verdict, not to every piece of evidence offered at trial. *Id.* at 503. As the trier of fact, the jury may "within the bounds of reason" reject inferences consistent with a defendant's innocence based upon its credibility determinations, its resolution of conflicts in the testimony, its weighing of the evidence, and its view as to what inferences can reasonably be drawn therefrom. *Id.* at 506-07.

¶7      The *Poellinger* standard of review applies in either a direct or circumstantial evidence case. *Id.* at 501. In reviewing the sufficiency of the evidence to support a jury's verdict, an appellate court may not substitute its own judgment for that of the jury "unless the evidence, viewed most favorably to the [S]tate and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *Id.* at 507. Under this standard, we are required to search the record for "facts that support upholding the jury's decision to convict." *State v. Hayes*, 2004 WI 80, ¶57, 273 Wis. 2d 1, 681 N.W.2d 203.

¶8      Grant's arguments challenging the sufficiency of the evidence to support the verdicts in this case fail principally because Grant does not apply the proper standard of review. Grant continually directs this court to testimony and inferences favorable to his innocence, rather than addressing other evidence and reasonable inferences a jury could have drawn that support the verdicts. We conclude that the following evidence, though circumstantial and requiring that

inferences be drawn by the jury, was not so lacking in probative value that the jury could not reasonably determine that Grant had deliberately started the fire that damaged the Cubby Hole building and then filed a fraudulent insurance claim.

¶9      Grant purchased the Cubby Hole building sometime around 2001, but the principal space in the building that had once housed a bar of that name had been vacant since 2012.  Grant listed the building for sale for $649,900 from August 29, 2014, through August 29, 2015.  He listed the building for sale between July 15, 2016, and July 31, 2017, for $550,000.  A realtor suggested Grant reduce the price to $299,000 because it was difficult to sell a building without tenants, but Grant refused to reduce the asking price by that much.  Grant instead listed the building for sale for $539,000 beginning November 3, 2017, and that listing was still in effect at the time of the fire.

¶10      Grant received no offers to purchase the property during the years it was on the market.  He was paying about $6,000 a year in taxes and another $1,000 a year for insurance, plus the cost of utilities, and maintenance, while his sole income from the building was between $10,000 and $12,000 annually, that his wife was earning each year from a salon she ran out of the building.  Grant told a State Farm examiner under oath that the reason he had listed the building for sale was that he was trying to get his wife to retire, "[a]nd if [they] could sell the building and not worry about that, [they] could do [their] own thing."

¶11      On September 27, 2018, about three months before the fire, Grant increased the insurance on the Cubby Hole building from $481,100 to $558,000.  About two days before the fire, Grant created videos documenting the contents of the building and a storage shed for insurance purposes.  Grant did not take insurance videos of any other properties he owned.  Also, shortly before the fire,

Grant switched to a different insurer than State Farm for all of the properties he owned except for the Cubby Hole building.

¶12     On December 24, 2018, five days before the fire, Grant brought a truck load of cardboard boxes and garbage from his home to the Cubby Hole building.  He piled the debris onto the grease trap in the former bar area.

¶13     Location data from Google showed that Grant's phone was in the vicinity of the Cubby Hole building from 1:21 p.m. to 2:43 p.m. on December 28, 2018, approximately 12 hours before the fire.  The phone did not return to the vicinity of Grant's home until 4:36 p.m.

¶14     Several agents from the Arson Bureau of the Wisconsin Department of Justice's Division of Criminal Investigation testified about the cause of the fire. The lead investigator identified the origin of the fire to be an older style, portable electric space heater with a metal grate that was located in an 18-inch void space in a collapsed section of the floor.  There was a partially melted red gasoline container next to the space heater and a noticeable odor of gasoline in the void space.  There was a "fairly straight line of damage" along the floor leading to the collapsed area that was consistent with the existence of "some type of fuel."

¶15     The space heater and gasoline container were covered by debris, which included wooden stick matches with green tips—some of which had been bundled together with black electrical tape.  In addition to the matches, an analyst from the Alcohol, Tobacco, Firearms and Explosives (ATFE) unit's crime laboratory noted that debris from wadded up paper was found inside the space heater's grill.  Samples of debris from the void space tested positive for gasoline.

¶16 An ATFE engineer testified that placing matches and fuel close enough to a space heater's heating elements is capable of causing a fire. The lead investigator testified that there were no signs of forced entry to the doors of the building. He concluded that the fire had been deliberately set and that an ignitable fuel had been intentionally distributed as a "trailer" to spread the fire.

¶17 During a search of Grant's residence after the fire, the lead investigator recovered a Menards receipt dated November 16, 2018, (about six weeks before the fire) showing the purchase of matches. Upon reviewing surveillance video from Menards, the lead investigator identified Grant purchasing a pack containing two 300-count boxes of green-tipped matches.

¶18 The ATFE analyst found that the matches in the box were of the same wood type and contained green heads like the matches recovered from near the fire scene, although the matches from the fire scene were too burned for a conclusive comparison. A code inside the box showed that the matches were manufactured on September 4, 2018. A separate ATFE agent testified that he recovered only one box of 300 green-tipped matches during a search of one of Grant's properties. Another Arson Bureau agent testified that she recovered a roll of black electrical tape from Grant's residence.

¶19 The insurance video of the storage shed that Grant recorded just two days before the fire showed a vintage space heater that was missing when the shed was searched after the fire. Additional personal items from an office and closet in the Cubby Hole building were no longer there after the fire.

¶20 After the fire, Grant submitted a sworn statement of loss claiming an actual cash value of $600,000 for the Cubby Hole building and $150,000 for the contents of the building, with replacement costs of $975,000 for the building and

$175,000 for its contents. State Farm's insurance adjuster described several potential indicators of fraud for the claim—including that the fire was incendiary, it happened after 11:00 p.m., the property had been for sale, and there had been a recent inquiry about increased coverage.

¶21 During the investigation, Grant provided law enforcement with inaccurate information on several occasions. Grant initially told investigators that it had been "months or even years since he had last purchased matches," when he had in fact bought matches mere weeks before the fire. Investigators found the insurance videos in a safe in Grant's residence, even though Grant at first denied even having a safe. Grant told investigators in one interview that he had been at the Cubby Hole building on the day before the fire for about 20 minutes to turn up the thermostats and had then gone over to a storage outbuilding to pick up some items for a planned trip. After being asked in a subsequent interview if GPS data from his phone would match the timeline Grant had given, Grant changed his story and said that he went to a nearby bar after leaving the Cubby Hole building.

¶22 Taken together with the uncontested evidence about how the fire was started, Grant's inability for several years to sell the Cubby Hole property for the price he wanted, his increased insurance coverage just months before the fire, his recording of videos to document the property and its contents just two days before the fire, his highly significant possession before but not after the fire of the type of space heater and matches used in the fire, his piling of flammable materials in the building days before the fire, his presence in the building hours before the fire, and his misstatements to police about several circumstances that might seem incriminating, all support a reasonable inference that Grant was the person who set fire to his building. Moreover, because Grant testified on his own behalf, the jury was able to judge for itself the credibility of Grant's denial of having set the fire.

¶23 Finally, Grant also challenges the sufficiency of the evidence to support the reckless endangerment count because the jury was not asked to identify the person whose safety was endangered. Based upon the fact that more than one firefighter was involved in fighting the fire, Grant argues that there is no way to tell if the jury agreed on which firefighter's safety was endangered.

¶24 Grant's argument actually conflates two distinct issues—whether there was sufficient evidence upon which the jury could rely to find him guilty of reckless endangerment and whether the jury's verdict was unanimous.[1] Grant has not established a right to relief under either theory.

¶25 We review the sufficiency of the evidence to support a criminal conviction by comparison to the instructions actually given to the jury, provided those instructions conform to the statutory requirements of the charged offense. *State v. Beamon*, 2013 WI 47, ¶22, 347 Wis. 2d 559, 830 N.W.2d 681. Here, the circuit court instructed the jury that the State needed to prove that Grant had endangered the safety of "another human being." *See* WIS JI—CRIMINAL 1347 (2015). That instruction properly relayed the relevant element of the offense set forth in WIS. STAT. § 941.30(2) (2023-24).[2]

¶26 Multiple firefighters testified to having battled the fire under dangerous conditions. Each firefighter plainly constituted "another human

---

[1] Grant also mentions a third theory that evidence about multiple firefighters who may have been endangered presents a multiplicity problem under the Double Jeopardy Clause. There can be no multiplicity issue where there is only a single count, however, because there is no risk of "multiple punishments." *See State v. Kurzawa*, 180 Wis. 2d 502, 515, 509 N.W.2d 712 (1994).

[2] All references to the Wisconsin Statutes are to the 2023-24 version.

being."[3]   In conjunction with the evidence discussed above showing that Grant started the fire, each firefighter who testified as to the dangerous conditions they encountered fighting the fire supplied sufficient evidence to support the verdict on the reckless endangerment count.

¶27   As to unanimity, Grant does not cite any authority requiring that a jury agree upon what person's safety was endangered for a single count of reckless endangerment.  We note that jury unanimity is required "only with respect to the ultimate issue of the defendant's guilt or innocence of the crime charged, and … not … with respect to the alternative means or ways in which the crime can be committed."   *State v. Derango*, 2000 WI 89, ¶14, 236 Wis. 2d 721, 613 N.W.2d 833 (citation omitted).

## II.  Prosecutor's Comments During Closing Argument

¶28   Grant challenges the following twelve comments the prosecutor made during the State's closing argument (with Grant's underlined emphasis added)[4]:

> 1.  He was planning this out.  He was planning to be out of town for the weekend.  <u>We believe</u> that the evidence supports that [Grant] started planning this out sometime in November.
>
> 2.  So, the fact that he was planning on being out of town, <u>I think</u> that is additional evidence that supports our theory of the case.

---

[3] Grant's argument that firefighters are not "human beings" because they are not entitled to restitution is absurd on its face and does not warrant further discussion.

[4] Where there are slight discrepancies between the language quoted in Grant's brief and the transcripts, we have used the language from the transcripts.  We have also expanded a few quotes for additional context.

3. <u>I think</u> the evidence supports that he was expecting the building to be completely burned down and there be no evidence left.

4. So, the biggest motive, $558,000. That's what he had his insurance to was $558,000. It was about 70—almost $77,000, <u>I believe</u>, from what it was back 93 days before the fire.

5. <u>I don't think</u> it's disputed that we have an arson here. I think that it's disputed on who did it.

6. So we've got all this fuel moved to the middle of the room, right to the middle of the whole building, … and [Grant] admits that he did all that. Whether it was to clean out the building or to pile it up there to make a fire go faster, that's for you to decide. And <u>the state believes</u> that the evidence shows that's his reason to burn it down.…[t]hat's why he was cleaning out the Cubby Hole and bringing more cardboard down there.

7. So, you have renters that went through. <u>I'm not going to beat this one</u>, but you have renters. And State Farm. We've heard what the—I think the important points are, on September 26th, the insurance was $481,000. 481,100. And then he upped it to—on 9/27 to $558,000. That is $76,900, 93 days before the fire.

8. So he bought 600 matches on the 16th. Law enforcement only recovered one box of those matches. And <u>the state believes</u> the evidence shows that that second box of matches went up with the Cubby Hole.

9. So, December 27th, [Grant] records his insurance video according to the first story that he told Agent Windorff.… So, <u>I think it's important</u> for showing his bar.

10. <u>I'm just going to point out</u> that in Exhibit 31, the display radius of meters when he was there, the maximum is 24 meters.

11. <u>I don't think</u> it's disputed anymore whether or not the space heater was actually found where law enforcement are saying they found it, at the bottom of the cavity filled with debris on top of it.

12. <u>And I don't believe</u> that there was a contest on whether [the space heater] could have fit in there.

11

Grant argues that these repeated references to what the prosecutor thought or believed constituted plain error and violated Grant's due process right to have his case decided upon the evidence.

¶29   The "plain error" doctrine "allows appellate courts to review errors that were otherwise forfeited by a party's failure to object." *State v. Miller*, 2012 WI App 68, ¶18, 341 Wis. 2d 737, 816 N.W.2d 331.  The doctrine is limited to "obvious" and "substantial" errors that are "so fundamental that a new trial or other relief must be granted" despite the lack of objection. *Id.* (citation omitted).

¶30   This court independently reviews the record to determine if a new trial is warranted due to plain error. *State v. Mayo*, 2007 WI 78, ¶28, 301 Wis. 2d 642, 734 N.W.2d 115.  Here, we conclude that Grant has failed to demonstrate that any of the prosecutor's comments constituted plain error.

¶31   A prosecutor is allowed to comment on the evidence, argue conclusions based upon it, and state that the evidence convinces the prosecutor of the defendant's guilt and should convince the jury. *State v. Draize*, 88 Wis. 2d 445, 454, 276 N.W.2d 784 (1979).  A prosecutor crosses the line into impermissible argument, however, by suggesting that the jury should arrive at a verdict by considering factors other than the evidence. *Id.*  The constitutional test is whether the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Wolff*, 171 Wis. 2d 161, 167, 491 N.W.2d 498 (Ct. App. 1992) (citation omitted).  Whether the prosecutor's conduct affected the fairness of the trial is determined by viewing the statements in context. *Id.* at 168.

¶32   Reviewed in context, we conclude that all of the statements Grant challenges were comments on the evidence and that the conclusions the prosecutor

12

argued could be drawn from the evidence. None of the comments adversely affected the fairness of the trial. In short, there was no error, much less plain error.

## III. Sentences

¶33 Grant challenges his sentences based upon several interwoven theories without any coherent discussion of the distinct standards applicable to his tangled claims. Grant primarily asserts that his sentences were "excessive" because he was 71 years old with no prior criminal history and because the circuit court heavily weighed the danger to firefighters in its evaluation of the seriousness of the offenses.

¶34 We first observe that an "excessive" sentence commonly refers to a penalty imposed in excess of that authorized by law. *See* WIS. STAT. § 973.13. Grant does not assert that any of his four sentences actually exceeded the maximum available penalties.

¶35 To the extent that Grant intended to argue that his sentences were excessive in the sense that they were unduly harsh, the test is whether they were "so disproportionate to the offense[s] committed as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances." *See State v. Grindemann*, 2002 WI App 106, ¶31, 255 Wis. 2d 632, 648 N.W.2d 507 (citation omitted). There is a presumption that a sentence "well within the limits of the maximum sentence" is not unduly harsh. *Id.*, ¶¶31-32 (citation omitted).

¶36 The maximum available penalty for the arson count was a bifurcated sentence consisting of 25 years' initial confinement followed by 15 years' extended supervision. *See* WIS. STAT. §§ 943.02(1)(b); 973.01(2)(b)3., (d)2. The

maximum available penalty for the reckless endangerment count was a bifurcated sentence consisting of five years' initial confinement followed by five years' extended supervision. *See* WIS. STAT. §§ 941.30(2), 973.01(2)(b)7., (d)4. The maximum available penalty for the unsafe burning of one's own building was a bifurcated sentence consisting of three years' initial confinement followed by three years' extended supervision. *See* WIS. STAT. §§ 941.11(1); 973.01(2)(b)8., (d)5. The maximum available sentence for the fraudulent insurance claim count was a bifurcated sentence consisting of one and one-half years' initial confinement followed by two years' extended supervision. *See* WIS. STAT. §§ 943.395(1)(a), (2)(b); 973.01(2)(b)9., (d)6.

¶37 When combined, the sentences here consisted of eight years' initial confinement followed by ten years' extended supervision. Thus, the circuit court imposed less than a quarter of the available 34.5 years' initial confinement time and less than a third of the available 59.5 years' total imprisonment time that Grant faced. The lengths of Grant's sentences were well within the maximum available penalties, and they do not shock the conscience, even taking into account Grant's age and lack of prior criminal history.

¶38 To the extent that Grant argues that his sentences were based upon an improper factor—which is an entirely separate issue from the length of the sentences—his argument appears to be premised on the false notion that a sentencing court is limited to considering what impact a crime had upon any persons who qualify as victims either under WIS. STAT. § 950.02(4)(a) or for restitution purposes. However, a court is not only allowed, but required, to consider the seriousness of the offense. *State v. Gallion*, 2004 WI 42, ¶23, 270 Wis. 2d 535, 678 N.W.2d 197. As part of its analysis into that factor, a court may properly look at what harms could have resulted from a defendant's conduct—

14

even to hypothetical members of the public. *See, e.g.*, ***State v. Dalton***, 2018 WI 85, ¶¶19-20, 383 Wis. 2d 147, 914 N.W.2d 120 (where the court observed that a driver who operated a motor vehicle while intoxicated "could have killed someone"). We conclude that a court is not prohibited at sentencing from considering whether firefighters were endangered by responding to a fire caused by arson.

¶39 Grant's remaining arguments amount to nothing more than an attempt to have this court reweigh the factors that the circuit court properly considered in its exercise of sentencing discretion. We will not do so.

## IV. Restitution

¶40 A circuit court is required by statute to order a criminal defendant to make full or partial restitution to compensate a victim for losses suffered as a result of any crime considered at sentencing, unless it finds, and states on the record, a substantial reason not to do so. WIS. STAT. § 973.20(1r); ***State v. Anderson***, 215 Wis. 2d 673, 682, 573 N.W.2d 872 (Ct. App. 1997). In addition, "[i]f justice so requires," the court may order restitution to any insurer, surety, or other person who has already compensated a victim for such a loss. Sec. 973.20(5)(d).

¶41 The scope of a circuit court's authority to order restitution presents a question of statutory interpretation subject to de novo review. ***State v. Ziegler***, 2005 WI App 69, ¶10, 280 Wis. 2d 860, 695 N.W.2d 895. However, determinations as to the amount of restitution, whether the defendant's conduct was a substantial factor in causing any claimed expenses, and whether justice requires compensation to an insurance company all lie within the court's discretion. ***Id.***; ***State v. Fernandez***, 2009 WI 29, ¶62, 316 Wis. 2d 598, 764

N.W.2d 509. We will uphold a discretionary restitution award so long as the court applied the correct legal standard to a logical interpretation of the facts of record. *State v. Muth*, 2020 WI 65, ¶14, 392 Wis. 2d 578, 945 N.W.2d 645.

¶42    Here, the parties do not dispute that Grant's wife was a named insured on the Cubby Hole building policy; that Grant's wife was not involved in the arson; and that State Farm jointly paid Grant and his wife $582,836.03 on the claim for damage to the building. Grant argues that State Farm did not actually suffer any loss because it was required under case law to pay Grant's wife as an "innocent spouse." That argument entirely misses the point.

¶43    If Grant's wife was innocent of the arson, then she was a *victim* of it. She suffered a loss in the form of extensive fire damage to a building she co-owned. The jury's verdicts establish that Grant caused that damage by setting the fire. State Farm compensated her for that loss. Therefore, WIS. STAT. § 973.20(1r) authorized the circuit court to order Grant to pay restitution to State Farm.

¶44    Grant does not point to any evidence showing that State Farm paid less than the claimed amount or that Grant had an inability to repay that amount.[5] Nor does Grant identify any other factor that would make it unfair for him to pay restitution. We conclude that the circuit court did not erroneously exercise its discretion when it determined that justice required Grant to pay State Farm restitution for the full amount of the insurance claim.

---

[5] To the contrary, Grant points to his wealth as evidence that he did not need the insurance money and, therefore, had no motive to commit the arson.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.